### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

v.

### SNYDER DOORS & Howard Snyder, Owner, In his individual capacity.

### Civ. A. No. 92–3449.

United States District Court, E.D. Pennsylvania.

Jan. 24, 1994.

---

Iria A. Santiago, E.E.O.C., Philadelphia, PA, for plaintiff.

Teri B. Himebaugh, Philadelphia, PA, for defendant.

Howard Snyder, pro se.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

In this action I am called upon to decide whether a worker was discriminated against on the basis of race in his wage rate and in being laid off from the work force, and whether he was not rehired in retaliation for filing suit against his employer with the Equal Employment Opportunity Commission. I find that the plaintiff has not proved that he was discriminated against on the basis of race in either the wage or layoff contexts, but that he has proved the retaliatory non-rehiring claim.

### FACTS

I conducted a bench trial on January 6th and 12th. From the evidence and testimony I make the following findings of fact.

1. Snyder Doors Corporation is a corporation operating in Philadelphia, Pennsylvania. Stipulation of Parties.

2. At all times material to this action, Howard Snyder has continuously been and is now an owner, Vice President, and General Manager of Snyder Doors. Stipulation of Parties.

3. Micah Bullock, a black male, has been employed at Snyder Doors since 1981. He ranks second in supervisory authority to Howard Snyder in the Company. Stipulation of Parties.

4. At all times material to this action, Snyder Doors has continuously had and does now have at least fifteen employees. Stipulation of Parties.

5. At all times material to this action, approximately seventy-five percent of the workers at Snyder Doors were black. Stipulation of Parties.

6. Plaintiff EEOC has met all statutory conditions precedent to the prosecution of this lawsuit under Title VII. Stipulation of Parties.

7. Snyder Doors hired David Powell, a black male, on December 13, 1982 to work in the Doors Department as a door assembler. Stipulation of Parties.

8. David Powell was hired with a starting hourly rate of $5.80 per hour. Stipulation of Parties.

9. David Powell was paid the following hourly rates as of the following starting dates.

   a. September 21, 1988—$9.25.

   b. September 20, 1989—$9.70.

   c. September 6, 1991—$10.00.

   d. September 20, 1991—$10.40.

   e. September 17, 1992—$11.00.

Stipulation of Parties.

These dates and wages are relied upon by the EEOC as the points of comparison with similarly situated white employees for the claim of racial discrimination in wage rates.

10. Richard Potter, Joe Wrightson, and Peter Rjabanedelia, three white males, were hired in or around 1984. Stipulation of Parties.

11. Richard Potter had taken on some supervisory and administrative responsibilities, different from the work done by David Powell, before April, 1990 when David Powell was laid off. Testimony of Howard Snyder and Richard Potter.

12. Richard Potter was paid the following hourly rates as of the following starting dates.

   a. January 7, 1989—$9.50.

   b. January 4, 1989—$10.00.

   c. May 24, 1989—$10.20.

   d. September 20, 1989—$10.50.

   e. September 20, 1990—$11.20.

   f. September 20, 1991—$11.65.

   g. September 17, 1992—$12.00.

Stipulation of Parties.

13. Peter Rjabanedelia was paid the following hourly rates as of the following starting dates:

   a. September 22, 1988—$9.50.

   b. September 20, 1989—$10.00.

   c. September 20, 1990—$11.00.

   d. September 20, 1991—$11.44.

e. September 17, 1992—$12.00.

Stipulation of Parties.

14. Joe Wrightson was paid the following hourly rates as of the following starting dates:

a. September 22, 1988—$9.50.

b. September 20, 1989—$10.00.

c. September 20, 1990—$11.00.

d. September 20, 1991—$11.44.

e. September 17, 1992—$12.00.

Stipulation of Parties.

15. No license, certification, or special skills are required for the job of door assembler, or almost any other job at Snyder Doors except the ability to read a tape measure, and minimal literacy and mathematical ability. Testimony of Howard Snyder. Employees learn their responsibilities on the job. Testimony of David Powell and Pete Rjabanedelia.

16. David Powell possessed the minimum qualifications necessary to gain employment as a door assembler at Snyder Doors. *See* Testimony of Howard Snyder. There is also no dispute that throughout his period of employment he was able and qualified to do the job for which he was hired. *See id.*

17. Howard Snyder frequently walks around the factory, monitoring the progress of work. Testimony of Howard Snyder. Frequently, he reprimands workers for talking on the job, and has also disciplined them when such talking becomes excessive. Testimony of Howard Snyder and Pete Rjabanedelia.

18. David Powell is an average worker, and at times displays a poor attitude. Testimony of Howard Snyder and Micah Bullock.

19. At the time of the layoff, his attendance had been sporadic. Testimony of Howard Snyder. At this time, David Powell was often unreliable in filling orders which were due on a date certain. Testimony of Micah Bullock.

20. David Powell is about as talkative as the average worker. Testimony of Joe Wrightson and Pete Rjabanedelia.

21. There are no written or clearly established policies at Snyder Doors regarding discipline, performance evaluations, layoffs or rate of pay. Testimony of Howard Snyder. Seniority is not a determinative factor for rate of pay or responsibilities. *Id.*

22. The usual format for giving raises is as a fixed percentage of rate of pay. Testimony of Howard Snyder. Several times during David Powell's employment, raises were dispensed by merit. *Id.* David Powell got a lower raise than some other workers in 1988 under this policy with an understanding that the decision would be reviewed. *Id.* In February of 1989, Howard Snyder dispensed with the merit raises and gave David Powell the full raise. *Id.*

23. Health care benefits are offered at Snyder Doors, Co. In 1989, the options were a Blue Cross/Blue Shield indemnity plan for which Snyder Doors provided full coverage, and a more expensive Keystone HMO plan for which Snyder Doors provided partial coverage, and required an employee contribution to cover the balance. Testimony of Kathy Snyder, Wife of Howard Snyder.

24. In 1989, the payroll deduction made to cover the employee contribution for workers receiving single coverage was $4.00 per week. Plaintiff's Exhibit 3. The payroll deduction for family coverage was $33.00 per week. *Id.*

25. In early 1989, David Powell switched from single to family coverage. Testimony of David Powell. Rather than pay the full $33.00 per week as a deduction from his paycheck, he reached an agreement with Howard Snyder that he would receive $.30 per hour less, an amount equivalent to a raise he had recently received, and in lieu of the higher salary, Snyder Doors would pay part of his employee contribution. Testimony of David Powell, Kathy Snyder, Howard Snyder. Testimony of both parties confirms that this arrangement was not imposed on David Powell, but was agreed upon.

26. David Powell thereafter contributed $21.41 from his paycheck towards the $33.00 employee contribution. Testimony of David Powell. Snyder Doors paid the remainder. *Id.*

27. David Powell's salary remained at $9.70 an hour in early 1989, rather than the

$10.00 per hour he would have earned had he not made the arrangement regarding health benefits. Testimony of David Powell.

28. Other employees had similar arrangements with Snyder Doors; some workers had their salary reduced enough to have the entire contribution paid by the Snyder Doors. Testimony of Kathy Snyder.

29. The benefit intended for the employees by giving them the choice to pay their health benefits through reduced wages, rather than in a lump amount coming out of their paychecks was that the reduced wages method meant that benefits were purchased out of pre-tax income rather than post-tax. Testimony of Kathy Snyder.

30. Joe Wrightson used the reduced wages method to pay his $4.00 a week of single health coverage. Testimony of Joe Wrightson.

31. At some point in 1989, Joe Wrightson received a raise which neglected to account for the health care coverage wage reduction he had arranged. Testimony of Joe Wrightson and Kathy Snyder. Snyder Doors continued to pay the same amount of Wrightson's employee contribution share. *Id.* Therefore, Joe Wrightson was receiving a subsidy to his health benefits different from that provided to other workers.

32. From February, 1989 to April, 1990, when David Powell was having his hourly rate reduced in exchange for a subsidy to his health coverage, he worked fifty-seven hours of overtime, or an average of less than an hour a week. Defendants' Exhibit 8.

33. In that same period, David Powell worked less than forty hours in thirty-six weeks. Six times he worked less than thirty hours in a work week. Once he worked less than twenty hours in a work week. Defendants' Exhibit 8.

34. On April 5, 1990, events occurred at Snyder Doors which ended with David Powell being laid off from work.

35. During the period preceding the layoff Snyder Doors was suffering a financial downturn. Testimony of Howard Snyder. Howard Snyder wanted to avoid layoffs to the extent possible. *Id.* He expected workers to work at the same pace in producing the company's products despite the downturn in orders, and then use other work time to do other tasks as instructed. *Id.* He required this behavior in order to maintain the efficiency of the business, and more importantly, to maintain a certain work standard for the employees. *Id.*

36. On the day of Powell's layoff, Howard Snyder approached Powell several times in the morning to reprimand him for excessive talking. *Id.* On each occasion, Powell would return to work, but in his next review of the factory, Snyder would find Powell talking again. *Id.* Snyder called Powell into his office. *Id.*

37. Snyder told Powell that if he did not want to keep working as required then he was welcome to take a layoff. *Id.* Powell declined this opportunity at this time. *Id.* However, later in the day Powell told Snyder he would take a layoff. *Id.* Howard Snyder's father, Irv Snyder, who was in the office when these encounters took place, confirms Howard Snyder's account of the conversation. Testimony of Irv Snyder.

38. Powell presented his conversation with Snyder to various co-workers as having been offered the choice of accepting a layoff, a choice which he was considering because he had other work opportunities. Testimony of Pete Rjabanedelia, Joe Wrightson and Micah Bullock. According to Joe Wrightson, Powell said he was choosing a layoff because Snyder was going to find a way to get rid of him anyway. Testimony of Joe Wrightson.

39. According to the testimony of David Powell, he was approached three or four times on April 5, 1990 by Howard Snyder and asked whether he wanted to take a layoff. Testimony of David Powell.

40. Powell insisted that he declined the layoff each time, but that when he punched his time card out at the end of the day, Howard Snyder grabbed it out of his hand and told him that he was officially laid off. *Id.* His account was not supported by other witnesses, and he did not present as witnesses in support of this account any of the co-workers who he testified as having observed

the day's events. I do not find this account credible.

41. Powell testified that the reason for the layoff revolved around a dispute regarding wages. *Id.* Powell contends that the wage reduction method used to pay for health benefits was working an injustice on him and others. *Id.* He claims that he told others of this unfairness, and that this activity provoked Howard Snyder's hostility to him which led to the layoff. *Id.* He contends that Howard Snyder was upset with him, not for talking on the job, but for the subject about which he talked. *Id.* This assertion does not contradict Howard Snyder's account that the layoff discussions emanated from Powell's excessive talking. Howard Snyder did not submit evidence regarding what Powell was talking about that day, and I find Powell's account on this issue to be credible.

42. Powell came back several times demanding his job back. Testimony of Howard Snyder. He was often hostile in these meetings. *Id.* Snyder had decided privately that when there was work available he would give Powell his job back. *Id.*

43. In June of 1990, Powell filed a charge of race discrimination with the Philadelphia Human Relation Commission. Stipulation of Parties. His complaint was eventually adopted by the EEOC which had joint jurisdiction with the PHRC over the charge. *Id.*

44. Defendant Snyder Doors was notified of the charge on August 14, 1990. Stipulation of Parties.

45. On August 13, 1990, Howard Snyder sent a letter to the EEOC which included the following:

> It was always my intention to call [Dave] back and with the recent long-awaited increase in orders I was preparing to do so when I received this complaint. It [the complaint] is so unjustified and based on untruth that I would no longer want him back.

Plaintiff's Exhibit 30.

46. On June 25, 1991, approximately 11 months later, Snyder sent another letter to the EEOC. He wrote:

> The purpose of this letter is to clear up a misunderstanding you have concerning my reaction to Dave Powell's filing a complaint with the Human Relations Commission. I wish to state that I fully support Dave's right to file this complaint ...

The letter continued:

> Although Dave requested his own layoff, my refusal to consider rehiring him is a result of his deceitful statements made to the Human Relations Commission, among other reasons. Since my reaction to his lies can be interpreted as punishing Dave for filing this complaint (which was not my intention), and because I have such respect for our system of equal employment, I have decided to rescind my decision: I will offer Dave the first available position in his department. Needless to say, Dave must first come clean and admit the truth. In my meeting today with you and Dave, I can only hope that Dave will tell all the truth and only the truth. If so, we can all put this unfortunate incident behind us.

Plaintiff's Exhibit 31.

47. During the time David Powell was laid off, a number of workers were hired. Testimony of Howard Snyder. Of these only one, Wesley Shaw, was hired specifically because of special skills. Testimony of Howard Snyder and Micah Bullock. David Powell was qualified to do the work that any of the other new employees were hired to do. Testimony of Howard Snyder. While many of these positions were in a department other than that in which David Powell was working, defendant concedes that the positions in the other department required less skill than David Powell had already exhibited in the door department. *Id.*

48. Howard Snyder asserted that all new hires besides Wesley Shaw were for temporary or fill-in positions. Testimony of Howard Snyder. He proffered no evidence confirming this, and I do not find this characterization to be credible. He acknowledged on direct examination that among those he designated as temporary hires he was always glad to find a "diamond in the rough" who could work full time. *Id.* Accordingly, even if I accepted his unsubstantiated characterization of the employees hired during David

Powell's layoff, Snyder has acknowledged that there was an opportunity for full time work during that period.

49. David Powell was recalled to work on August 22, 1991 and continues to work at Snyder Doors as a door assembler. Stipulation of Parties.

50. No overtly racist statements or actions were attributed to Howard Snyder by David Powell or other witnesses. According to Powell, Howard Snyder once said about members of the MOVE group "they all should have died in the fire." Testimony of David Powell. David Powell took this as a racist remark. *Id.* No other evidence suggested that the remark was racial, and I find that this one isolated remark was not proved to be racist.

51. Other workers, including Pete Rjabanedelia and Richard Potter, have been involved in fights, dangerous pranks, and excessive talking without being laid off. Testimony of Pete Rjabanedelia and Richard Potter.

52. Richard Potter was laid off for a short time for moonlighting. Testimony of Richard Potter. He had layoff threatened for missing time. *Id.*

### DISCUSSION

#### I. Race Discrimination

A claim of race discrimination must be analyzed under the shifting burdens of proof established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center, Et al. v. Melvin Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ First, the plaintiff must prove a prima facie case by establishing that he was a member of a protected class, and that he was treated negatively (ie. layoff or lower wages) vis-a-vis similarly situated individuals who are not a member of the class. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94.

■ Once the plaintiff establishes a prima facie case, the burden switches to the defen-

dant to show that there was a legitimate non-discriminatory reason for the negative action. *Id.* at 254, 101 S.Ct. at 1094.

■ If the defendant offers the non-discriminatory reason, the plaintiff must prove that the reason was a pretext—that the proffered reason was not a true reason. *Id.* at 256, 101 S.Ct. at 1095. Even after the plaintiff has shown pretext, he or she retains the ultimate burden of proving that the adverse action was done for discriminatory reasons. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749. This final showing can be done through circumstantial evidence, including the fact of the uncredible pretext. *Id.*

#### A. Wage Difference

David Powell's claim of discrimination regarding wages is two-pronged. First, he claims that he was harmed by the arrangement regarding his medical benefits by which his wage rate was reduced from $10.00 to $9.70 in exchange for an increased subsidy towards his family health coverage. Next, he argues that his overall wage was less than similarly situated white employees.

■ The first contention arguably fails to state a prima facie claim. While Powell had his wages reduced as part of the health care arrangement, and some white individuals did not, *see* testimony of Pete Rjabanedelia and Richard Potter, it is not at all clear that the arrangement was negative treatment. David Powell chose this alternative wage/health benefit arrangement. There is no evidence that he was coerced in that direction. Furthermore, the arrangement was offered to Powell and other workers because it would provide them the benefit of paying for health costs out of pre-tax rather than post-tax wages.

Powell's principal contention regarding the unfairness of the arrangement is that if he worked overtime, he would continue to pay lose $.30 an hour from his wages, even after the reduction went beyond the amount Snyder Doors had subsidized his employee contribution. Since his reduced wages were meant to compensate for approximately $12 which the company was subsidizing, once he went above 40 hours he would be forgoing

$.30 an hour which was not necessary to compensate the company for the subsidy.

However, the evidence indicates that Powell did not work a great deal of overtime, so the eventuality of his overcompensating for the subsidy was a rarity. In fact, it was more common for Powell to work less than forty hours a week, many times as low as twenty-twenty-five hours. In weeks when Powell worked less than forty hours, the wages he lost under the arrangement would have been insufficient to compensate Snyder Doors for the subsidy it contributed to the health coverage.

Even if Powell had proved any unfairness in this arrangement, he has proffered no evidence indicating that the arrangement was offered to him, or foisted upon him because of race. Powell never suggested that he did not have a choice whether to accept this arrangement, and he was not alone in using it.

Joe Wrightson testified, and Kathy Snyder confirmed, that Wrightson did at one point get his health care subsidized beyond the amount that he had his wages reduced. In comparison to Mr. Wrightson, David Powell was negatively treated. Defendants' never explained why Wrightson received this additional subsidy, although Kathy Snyder made some allusion to an accounting error. The subsidy, however, was de minimis as Wrightson had single coverage which required only $4 a week employee contribution. This beneficial treatment resulted in only about $1–2 extra per week for Wrightson. Furthermore, there is no evidence that this minimal subsidy was granted Wrightson, or withheld from Powell, because of race.

■ Powell also claims race discrimination based on overall wages. In the stipulated findings of fact, five dates are included for Mr. Powell to establish wage rates. Three of these dates follow the period when Powell was laid off and recalled to work. Powell, when he was rehired, began at the wage he was earning when he was laid off, and received the same raises as other individuals. Accordingly, the wage discrepancy between him and the compared white individuals for the last three dates stipulated to is due to his missing the raises which the others received

during the time he did not work. There is no evidence, and I do not understand plaintiff to argue, that the discrepancy is due to race as opposed to this reason.

That leaves two dates of comparison. On September 21, 1988 David Powell earned $9.25 per hour; Rjabanedelia, Potter, and Wrightson earned $9.50. On September 20, 1989, Powell earned $9.70; Rjabanedelia and Wrightson earned $10.00 and Potter earned $10.50.

In September of 1988, Howard Snyder varied from the usual practice of giving raises as a percentage of wage rate, and awarded raises partly on merit. David Powell received a lower raise than the others in that year, which created the $.25 discrepancy. According to Snyder, Powell's attendance had been sporadic, and his attitude questionable. This appraisal was supported by the testimony of Micah Bullock. He explained this reasoning to Powell, and also promised him that this decision would be reviewed in February. This review occurred, and Snyder gave Powell the full raise in February. While the stipulated facts do not indicate the February raise, plaintiff offered no evidence to rebut this account.

Nor did plaintiff offer sufficient evidence to prove that the different raises in September of 1988 were not based on merit. Micah Bullock, Howard Snyder's second-in-command, confirmed Snyder's appraisal regarding Powell's attitude and attendance. Furthermore, plaintiff offers no evidence that the raise decision, even if incorrectly made, was racially motivated.

At the second wage juncture, Powell's wage is $.30 below Wrightson and Rjabanedelia. However, that $.30 represents the arrangement regarding health benefits discussed above. Powell's assigned wage actually was the $10.00 per hour which Wrightson and Rjabanedelia were getting, but his rate appears lower because he arranged for a health care subsidy different from the other two. Accordingly, Powell received no different treatment from his white counterparts.

Powell did receive less than Richard Potter in September, 1989, and accordingly makes

out a prima facie case based on this comparison. However, as Snyder and Micah Bullock testified, Potter had distinguished himself from other workers by displaying a level of responsibility and attention to detail which allowed him to take on additional duties in the shipping department. Powell did not rebut that Potter had different responsibilities than him. Nor did he offer any evidence independent of the wage discrepancy which indicated that the decision was racial. The fact that Potter surpassed white co-workers Wrightson and Rjabanedelia in wage rate at the same time he surpassed Powell reinforces the assertion that the difference was based on merit and not race.

### B. The Layoff

■ Powell alleges that his layoff was racially motivated. He makes out a prima facie case as a member of a protected class who was laid off while similarly situated white employees were not laid off. Furthermore, other employees testified that they have not suffered the severe sanction of layoff as discipline for excessive talking. Plaintiff's Direct Examination of Pete Rjabanedelia.

According to Howard Snyder the reason why Powell was laid off was that, in the culmination of a dispute over work behavior in which Snyder offered the layoff, Powell chose a layoff. This account is supported by the testimony of Irv Snyder, who witnessed the communications between Powell and Howard Snyder, and co-workers Micah Bullock and Joe Wrightson, who based their perceptions on Powell's own reports.

However, even if I accept Powell's unsupported testimony regarding the events, he has not met, by his own implicit acknowledgement, the ultimate burden of showing racial discrimination required by *St. Mary's Honor Center, et al. v. Melvin Hicks.* According to Powell, Howard Snyder's actions on April 5, 1990—the private meetings, the offer of layoff, the forced layoff—were all motivated, not by his talking or disruptive behavior, but his topic of conversation. According to Powell, Snyder was upset that Powell had found out and was exposing to other workers, the "wage discrepancy" created by the health care arrangement.

As I have discussed above, this wage arrangement was offered as a choice to the workers, provided the benefit to workers of paying for health costs out of pre-tax dollars, and resulted in Snyder Doors paying for more than the agreed share of health costs whenever an employee worked less than forty hours a week. But even if Powell were correct that he had exposed unfairness by Snyder Doors, unfairness which might have existed for workers who, unlike David Powell, worked significant overtime hours, and correct that the exposure was what motivated Howard Snyder's hostility, this merely reinforces Snyder Door's defense that the layoff was not racially motivated, but rather grounded in an identifiable employer-employee dispute. Powell's own reason for his layoff provides the non-racial motivation for it. Powell adds no additional evidence that suggests that racial hostility rather than an employer-employee dispute, whether it be Howard Snyder's characterization or Powell's, caused the dispute.

### II. Retaliatory Non–Rehiring

■ To establish a prima facie case for retaliation, Plaintiff must show (1) that the charging party engaged in a protected activity; (2) that the charging party was not recalled subsequent to or contemporaneously with such activity and, (3) that a causal link exists between the protected activity and the failure to recall. *Jalil v. Avdel Corporation,* 873 F.2d 701, 708 (3d Cir.1989).

David Powell was engaged in the protected activity of filing a suit with the EEOC and he was not recalled until August of 1991. The two letters sent by Howard Snyder constitute incredibly strong evidence that the pursuit of the EEOC suit was causally linked to the decision not to rehire Powell. While the second letter attempts to justify the first by making clear that Snyder was retaliating not against the lawsuit itself, but against Powell's allegedly dishonest statements in pursuing the claim, it is nevertheless qualified by the statement that for Powell to get his job back he must tell the truth about events in the presence of Snyder and the EEOC investigator. Taken as a whole, the effect of the second letter can be read as exacerbating the

retaliatory effect of the first letter, as easily as it can be read to take the sting from it.

More importantly, the premise of the second letter, that Snyder was retaliating not against the filing of the EEOC complaint, but against the untruths told in carrying it out, carves out a distinction too fine to be meaningfully justiciable. Except in the most blatant instances, it is probably the case that most employers accused of improper treatment of and discrimination against their workers will perceive events differently than the worker. To treat as dispositive the distinction between the employer's view of the procedural act of filing a complaint, and his or her views of the allegations made within it, would elevate form over substance to an unwarranted degree.

Defendant's alternative explanation for why Powell was not rehired, the lack of available work, is simply not credible. Howard Snyder acknowledged that he had made the decision shortly after the layoff that he would rehire Powell when there was more work available. Testimony of Howard Snyder. However, following the layoff he hired several workers for positions that he acknowledged David Powell was more than qualified. While, defendant testified at trial that the workers hired for positions that Powell was qualified for were hired on a "temporary" basis, he also suggested that such workers had a make good opportunity. Both his words and my interpretation of his explication of this arrangement led me to believe that Snyder Doors treated the positions as "temporary" because of concerns regarding the quality of the new employees, not because there wasn't room for a permanent worker. Furthermore, Howard Snyder's testimony, and his answers on cross-examination regarding specifically designated new employees, did not convince me that all the new hires were in fact "temporary" hires. No other evidence contradicted this understanding.

In light of the convincing evidence of retaliation—the letters to the EEOC—and the defendants' failure to rebut the meaning of those letters, or to provide a credible alternative reason for the failure to rehire after evincing a desire to do so—I find that plaintiff has proved that a causal link exists between his EEOC action and his failure to be rehired until August of 1991, and that he has made out all the elements of a retaliatory non-rehire action.

The parties stipulated to the date Howard Snyder was put on notice of the EEOC suit as being August 14, 1990. Accordingly, I will calculate damages to David Powell from the that point until his re-hire in August, 1991.

The plaintiff submitted evidence that David Powell's backpay damages should be $20,435.38 for the period from April 5, 1990, the day of layoff, to December 1, 1990, and $17,485.22 for the period from December 1, 1990 to August 1st, 1991. The defendants submitted no evidence on damages, nor have they made legal arguments in opposition to plaintiff's calculations.

Because I have found for the plaintiff only on the retaliatory non-rehire, the damages for 1990 should reflect only the period after which the defendants were aware of Powell's EEOC suit. The parties have stipulated that August 14, 1990 was the date on which Howard Snyder was put on notice. The period between August 14, 1990 and December 1, 1990 includes only sixteen of the thirty-five weeks included in plaintiff's calculations. Accordingly, I will adjust the calculation proportionally downward to $9341.89. Added to the 1991 damages, the correct backpay owed in compensation for the retaliatory non-rehire is $26,827.11.

AND NOW this 24th day of January, 1994, IT IS ORDERED that the defendants Snyder Doors, Inc. and Howard Snyder will pay David Powell compensatory damages in the sum of $26,827.11.